# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 24-cr-00271-TJK** |
| | : | |
| **DANA JEAN BELL,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Dana Jean Bell to a term of 27 months of incarceration, at the mid-range of the applicable advisory Sentencing Guidelines range of 24 to 30 months, plus three years of supervised release, $2,000 in restitution, a fine, and the mandatory $100 special assessment.

## I.     INTRODUCTION

The defendant, Dana Jean Bell, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol Building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and

On January 6, 2021, Bell, a 62-year-old woman, belligerently pushed, grabbed, and verbally attacked countless U.S. Capitol Police ("USCP") and Metropolitan Police Department ("MPD") officers who were attempting to clear rioters from inside the United States Capitol Building. Just moments after one rioter was shot in the House Speaker's Lobby, and as officers were performing lifesaving procedures on that individual, Bell inserted herself among the officers, ignored their commands to leave the area and, instead, screamed "FUCK YOU" in their faces while giving them the middle finger. Minutes later, Bell is captured on MPD body-worn camera verbally harassing other officers, including standing in front of one MPD officer and stating as follows: "Get a real job, get a real job! We don't support y'all anymore. Now no one supports you! Nobody!" Tragically, Officer Smith took his own life on January 15, 2021, a death that the D.C. Police and Firefighters' Retirement Relief Board ruled was in the line of duty.

After spending approximately 30 minutes inside the Building, Bell finally exited the U.S. Capitol Building through the Upper House Door. Before doing so, however, she physically assaulted multiple MPD officers. In the charged assault, she spun around towards MPD Officer K.A., forcibly shoving her left shoulder into his body, grabbing his outstretched baton, and pulling it towards her. Then, as officers finally funneled Bell out through the door's magnetometer, she again spun around and screamed belligerently at the officers, giving them the middle finger.

---

is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Bell's assaultive conduct did not end there, though. After leaving the Capitol Building, Bell made her way to the Capitol's north lawn, where she approached a news crew, joining a crowd that was giving the news crew the middle finger, calling them "traitors" and "fake news," and telling them to "get out." Bell then began attempting to push and grab at a certain female news anchor, who was recording the event on her cell phone. Bell then raised her hand and attempted to kick another individual when that person attempted to intervene.

The government recommends that the Court sentence Bell to 27 months of incarceration for her conviction under 18 U.S.C. 111(a)(1). A 27-month sentence reflects the gravity of Bell's conduct, but also acknowledges her early admission of guilt and lack of criminal history.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the statement of facts filed in this case, ECF 1-1, for a short summary of the January 6, 2021 attack on the United States Capitol.

### B.     Bell's Role in the January 6, 2021 Attack on the Capitol

Bell traveled from Texas to Washington, D.C. with her adult daughter to attend the Stop the Steal rally on January 6. On that day, Bell wore a dark leather-type jacket, a white long-sleeve shirt with the slogan "Make Christmas Great Again" (depicting President Trump in reindeer antlers), and blue jeans; at times, she also wore a purple backpack, a gray knit winter hat, and carried an American flag. Bell also carried a cell phone with a rose-colored folio case that depicted an American flag backdrop and images of former President Donald Trump (one posing shirtless as the character Rocky Balboa from the movie Rocky).



*Images 1, 2: Bell on January 6, 2021*

### Bell's Participation in the Riot on the Capitol's East Front

Bell arrived on the Capitol's east front before crowds began amassing there. However, once crowds had developed, and as USCP officers approached the barricades to attempt to calm the increasingly rowdy crowd, Bell made her way to the very front of the mob. As other rioters were chanting, "They're not MAGA" towards the police, Bell began shaking the bicycle rack barricades that marked the restricted area around the Capitol. As she shook the bike racks, Bell scowled at the group of USCP officers who were reinforcing the barricades, gave them the middle finger, and shouted "FUCK YOU" at them, among other things.

4



*Images 3 (Capitol Diagram), 4 (Ex. 1 at 00:10): Bell giving USCP officers the middle finger as she shook bike rack barricades on the east front.[2]*

---

[2] An index of the government's sentencing exhibits is attached hereto as <u>Attachment 1</u>.

By approximately 2:05 p.m., certain members of the mob on the east side had turned violent. They pushed over, past, and through the bicycle rack barricades, forcing the outnumbered USCP officers to retreat backwards and to abandon their posts near the barricades.



*Image 5: Still from CCTV looking eastward over the Capitol's east front shortly after rioters broke through barricades and illegally entered the restricted area.*

Within minutes, hundreds of rioters had flooded into the restricted area on the east side of the Capitol, forcing the Capitol Police officers to further retreat. Eventually, the mob overcame the officers on the East Rotunda stairs and took over the platform area outside the East Rotunda doors. The mob had forced the small number of officers all the way back to the East Rotunda doors where they formed a small police line. With their backs to the doors, the officers sought to prevent rioters from breaching the doors and entering the U.S. Capitol Building.

By approximately 2:24 p.m., the USCP deployed a flashbang-like device that emitted a loud "bang" noise and smoke, intended to disperse the angry crowd.   The mob, including Bell, remained undeterred. Within the next minute, a rioter already inside the Capitol began pushing the

East Rotunda doors from the inside, which allowed the rioters outside the door to grab hold of and briefly open the doors. The doors were open for about two minutes initially before the police succeeded in shutting them.

About ten minutes later, around approximately 2:35 p.m., the mob outside the doors began chanting loudly and excitedly while rioters inside continued attempting to reopen the East Rotunda doors. Rioters fought with USCP officers outside the doors, including by assaulting the officers with pepper spray and ripping at least one police riot shield out of an officer's hands. During this chaos, Bell made her way to the front of the mob and positioned herself directly in front of the East Rotunda doors, whose windows were visibly shattered.

As the rioters inside the Building forced the East Rotunda doors open for a second time, Bell grabbed the door from the outside to help pull it open. As she did so, USCP Officer T.M. was directly to her right and sought to push the door closed. As that officer was overcome by the mob, including Bell, he became trapped behind one of the two doors that Bell was helping to pull open. Another USCP officer near Bell (Special Agent J.P.) momentarily lost consciousness and fell into the crowd after being pepper sprayed in the face and then pinned behind the door.





*Images 6 (Capitol diagram), 7 (Ex. 2 at 00:10): Bell reaching to pull open East Rotunda Doors as USCP Officers T.M. (blue arrow top right) and USCP Special Agent J.P. (blue arrow bottom right) become pinned behind the doors.*

Testifying in the trial of another January 6 defendant, Special Agent J.P. described those

harrowing moments as follows:

> Q. So at the point at which your back is pressed up against the Capitol wall, you are hugely outnumbered, what were you trying to do at that point? What was your goal?

A. It was just to get the rioters back, push them back to create a barrier between them and the Capitol rotunda door so they couldn't get inside of the building.

Q. Did you succeed in doing that?

A. No.

Q. Why not?

A. Me personally, I was maced in the eye, exhausted, beaten. Same thing with the other officers. We just took a pummeling. And there wasn't enough of us. We were so outnumbered. I cannot stress how outnumbered we were . . .  I ended up falling down to the ground. I couldn't see. A rioter tried to take my baton from me. I had to fight my way back up.
. . .
I noticed that there [was] another officer who's kind of pinned against the rotunda door. And I try to make my way to him to assist him and try to get the rioters away from the rotunda door. Unfortunately, in doing so, I got pinned against that door myself. I then had a rioter pressed up against my chest with me still trying to have weapon retention with my right arm down and my baton out. With every breath, it was getting shorter and shorter. I couldn't take full breaths anymore. And I started to get dark circles that come around your eyes right before you black out.

Q. Did you black out?

A. I did.

Q. Did you fall to the ground?

A. I was, fall slash yanked out of the doorway by rioters.

. . .

Q. Were you at that moment completely defenseless?

A. I was. It is a small miracle that I wasn't trampled or murdered with my own weapon . . . The things that were going through my head[?] [Y]ou know, was I going to make it. What if someone did get my gun. Would one of my fellow officers be killed? You know, it's a nightmare for any cop. [Officer becomes choked up]. Excuse me.[3]

---

[3] *See* Oct. 24, 2023 Trial Tr., *United States v. Easterday*, 22-cr-00404 (JEB) at 84-85, 97-100.

### *Bell's Entry Into the Capitol Building and Time in the Rotunda*

By approximately 2:36 p.m., the mob had successfully breached the East Rotunda doors for a second time and rioters were pouring in. Bell entered the U.S. Capitol Building at 2:36 p.m.; Bell celebrated after making it inside, crying out and raising her hands in the air.



*Images 8 (WaPo still), 9 (Still from zoomed in CCTV): Bell celebrating after illegally entering the U.S. Capitol Building.*

Once inside the U.S. Capitol Building, Bell entered the Capitol's Rotunda, the Building's "heart and symbolic center."[4]  Initially, Bell sat on a bench in the Rotunda as she fiddled with the American flag she carried. Moments later, she got up and hurriedly approached the stanchions that designated the corridor in the middle of the room through which visitors normally were required to walk. As she got sufficiently close to one stanchion, she picked it up and violently hurled it so that it slid horizontally across the room's waxed Seneca Sandstone floors. *Id.*



---

[4]  *See* https://www.visitthecapitol.gov/rotunda-360-indigenous-peoples-capitol-art.



*Images 10, 11: (Ex. 3 at 2:20 – 2:26): Bell inside Capitol's Rotunda where she hurled a stanchion onto the floor.*

Bell then continued through various hallways carrying an American flag, taking pictures, and engaging with other rioters and law enforcement officers.

### Bell's Belligerent Conduct Towards USCP Officers Attending to Fatally Wounded Rioter

By approximately 2:45 p.m., Bell had made her way to just outside the Speaker's Lobby, where one female rioter had just been wounded by a police gunshot. U.S. Capitol Police who responded to the crisis attempted lifesaving procedures and ordered rioters to clear the area. One USCP officer was gesturing for rioters to leave the small, chaotic stairwell area, ordering rioters as follows: "Space, just give us space right now!" Referring to the injured rioters, another officer exclaimed, "They gotta' get to her!" Around that time, Bell physically inserted herself among these officers. Then, seconds later, as another officer yelled at the rioters to, "Get the fuck back . . . get out!", Bell instead moved close to the officer's face, pointing and swearing at him, as she screamed

directives at him for upwards of a minute.





*Images 12 (Capitol diagram), 13 (Ex. 4 at 00:46 – 1:55): Bell near Speaker's Lobby interfering with USCP Officers as they attempted lifesaving procedures on fallen rioter.*

     Officers continued ordering the rioters to leave the area, and Bell continued ignoring them. Then, Bell again stood approximately one foot away from one officer, Officer K.Y., as that officer yelled, "Guys, go! Go back – they gotta' get to her! GO BACK!" Bell then moved close to that officer's face, pointed, and yelled at him and the officers next to him, "FUCK YOU!" while giving them the middle finger.

13



*Image 14: (Ex. 4 at 00:46 – 1:55): Bell near Speaker's Lobby giving officers middle finger as she exclaimed, "FUCK YOU" to Officer K.Y., among others.*

Testifying in the trial of another January 6 defendant, Officer K.Y. described these moments as follows:

Q. [Watching video exhibit of Speaker's Lobby]. What is going on here?

A. People are continuing to stay in the area. Somebody said, "You guys are going to continue shooting everyone." . . . People are still remaining in the area. And then we got a couple of officers to help push people out as well.
. . .

Q. At this point in time, what are you simply doing?

A. Trying to get people out and trying to get as much control as possible and de-escalate the situation.

Q. [Watching additional video of Speaker's Lobby]. What is happening?

A. People are still screaming obscenities, staying in the area, not leaving.

Q. Can you hear someone questioning why the person was shot?

A. Yes.

. . .

Q. Did you hear the person say, "I can't even rationalize that"?

A. Yes.

Q. Can you rationalize what you had witnessed on January 6?

A. No. January 6 was one of the worst days of my life. It is wildly uncomfortable to -- every time I look at this stuff.

. . .

Q. And Agent [K.Y.], while everyone was at the Speaker's Lobby, what was happening there? Did that affect your ability to effectuate your mission of protecting the people in the Capitol that day?

A. Yes, ma'am, it did.

Q. How?

A. People remaining in the area made it so that we couldn't render aid to this person. We couldn't get her out to emergency response. And with three officers, compared to the amount of protesters, we couldn't maintain a police line.[5]

After finally exiting the area, Bell continued to watch, film, and talk on her cell phone as other rioters angrily banged on the locked doors to the House Chamber.

### Bell's Verbal Assaults on MPD Officers, Including MPD Officer Jeffrey Smith

By approximately 2:50 p.m., MPD officers had responded to the Capitol as reinforcements for the USCP. MPD officers responding to the hallways near the Speaker's Lobby were ordering rioters, including Bell, to exit the Capitol Building through the Upper House Door on the Capitol's southeast side.

As the MPD officers attempted to funnel rioters from inside the Building and out the door, they verbally ordered rioters, including Bell, to keep moving towards the exits. They were also

---

[5] *See* Nov. 13, 2023 Trial Tr., *United States v. Sullivan*, 21-cr-078 (RCL) at 159-161.

gesturing towards the doors. Where rioters were noncompliant, the officers held their batons horizontally and used them to push the rioters forward.

Around 2:53 p.m., Bell rounded the hallway's corner and looked directly at one MPD officer and exclaimed, "Don't fucking touch me!" When she asked about leaving through a different exit, an officer ordered, "You gotta' go out that way," pointing to the Upper House Door to his right. Bell responded, "I just want out of here!" Rather than comply, Bell then stopped, turned toward that officer, and said, as she gave him the middle finger, "Y'all suck. I used to back you guys my whole life till two weeks ago."



*Images 15, 16: (Ex. 5 at 00:03 – end): Bell being funneled towards exit while verbally harassing MPD officers, including MPD Officer R.S. (BWC-BKR6).*

Bell then continued standing still with her back to the officers and ignored their commands to continue towards the exit. Between 2:53 and 2:55 p.m., the MPD officers were forced to physically move Bell towards the exit by pushing her. At the same time, the officers were audibly ordering Bell and other rioters around her to "get out." After the officers touched Bell's shoulder, an MPD officer used his horizontal baton to move Bell forward. Bell then spun around towards the MPD officer and screamed, "STOP FUCKIN' PUSHIN' ME!" She then took a step in the direction away from the officers, but immediately turned back, pointed in the face of that MPD

officer, and angrily exclaimed, "Don't touch me again!" At around the same time, an officer can be heard pleading, "Please go!" As Bell moved down the hallway, she then called at least one officer a "fucking pussy traitor" and a "cunt."

Bell's verbal assaults continued. At 2:55 p.m., Bell stood directly in front of MPD Officer Smith. She got up close to him, shouted, and shook her hand in his face, stating: "Get a real job, get a real job! We don't support y'all anymore. Now NO ONE supports you! Nobody!"





*Images 17, 18: (Ex. 6 at 00:43 – 00:55): Bell continues verbally assaulting MPD officers, including Officer Smith (BWC- BCZM).*

Tragically, Officer Smith took his own life following January 6, a death that the D.C. Police and Firefighters' Retirement Relief Board ruled was in the line of duty because he "sustained a

personal injury on January 6, 2021, while performing his duties and that his injury was the sole and direct cause of his death."[6] Although the personal injury Officer Smith sustained occurred after his interaction with Bell, her verbal barrage towards him is a prominent part of his body-worn camera footage from that day. Officer Smith's wife has submitted a victim impact statement, which is attached hereto as Attachment 2.

### *Bell's Verbal and Physical Assaults on MPD Officer S.H.*

Within the same minute as her verbal assaults on Officer Smith, Bell next turned towards MPD Officer S.H., pointed, and said, "Don't touch me! DO NOT TOUCH ME!"



*Image 19: (Ex. 7 at 00:10 – 00:42): Bell continues verbally assaulting MPD officers, including Officer S.H. (BWC-B9CK).*

---

[6] *See e.g.,* Ryan J. Reilly, *DOJ finds police officer's suicide after Jan. 6 attack was a death in the line of duty* (Aug. 18, 2023, 3:39 PM EST) (available at https://www.nbcnews.com/politics/justice-department/doj-finds-officers-suicide-jan-6-was-death-line-duty-rcna100648) (noting that Officer Smith's death has been ruled a line of duty death by the Metropolitan Police Department, the D.C. Police and Firefighters' Retirement Relief Board, and the Public Safety Officers' Benefits (PSOB) Office); Ryan J. Reilly, *A Police Officer Died by Suicide After Jan. 6. Here's What He Went Through At The Capitol*, HUFFPOST (Jan 27, 2022, 05:45 AM EST, updated Jan 28, 2022) (available at https://www.huffpost.com/entry/jeffrey-smith-capitol-riot-suicide_n_6172c53de4b06573573a9ba4).

That officer immediately responded by pointing toward the door and yelling, "Move, NOW!" Because Bell was not listening to the officer's orders and was instead giving him orders, MPD Officer Smith used his horizontally held baton to forcefully push Bell forward twice. As he did so, an officer yelled, "Get outta' here! Move! Let's go! We're not fucking around!" An officer in the same vicinity then used his horizontally held baton to forcefully to push Bell forward, moving her towards the exit, as Bell simultaneously responded, "I'm going!"

However, even after the officer's push toward the exit, rather than comply and continue moving forward, Bell turned around towards the officers behind her. MPD Officer S.H. then used his horizontal baton to move Bell forward. Intending to stand her ground, she threw her elbow multiple times into the officer's chest, making physical contact with Officer S.H., as she muttered, "fuckin' pieces of shit!"



*Images 20 – 23 (Ex. 7 at 00:10 – 00:42): Bell physically assaults MPD Officer S.H. by throwing her elbow into his chest (BWC-B8CK).*

The officers continued using their batons and pushing forward, repeatedly yelling, "Move! Move back!" But Bell continued to resist, turning around towards the moving police line and swearing at the officers.

### Bell's Verbal and Physical Assaults on MPD Officer K.A. (Count One)

Seconds later, Bell neared the magnetometer that sat just inside the North Door's exit, where MPD Officer K.A. was stationed. Officer K.A. repeatedly motioned with his hands towards the exit and verbally ordered rioters to "Move, move, move." As Bell was engaging with the moving police line behind her and directing officers to, "Stop pushin' me!", Officer K.A. could see her approaching from his left. Because Bell kept turning around to engage with the officers behind her, Officer K.A. used his horizontally held baton to push Bell forward, while repeating, "Move, move, move." Rather than comply, Bell spun around towards Officer K.A., and forcibly made physical contact with him by shoving her left shoulder into his body.



*Image 24 (Ex. 8 at 00:13 – 00:30): Bell physically assaults MPD Officer K.A. by shoving her shoulder into his chest (BWC-BCQN).*

Then, using her right hand, she grabbed Officer K.A.'s outstretched baton, and forcibly pulled his baton towards her. At the same time, Officer K.A. continued verbally ordering Bell to exit, while pushing her in that direction with his horizontally held baton. Even as she turned the other direction, she refused to release her grip on Officer K.A.'s baton for nearly 10 seconds.







*Images 25-28 (Ex. 8 at 00:13 – 00:30): Bell physically assaults MPD Officer K.A. by grabbing hold of and pulling his baton (BWC-BCQN).*

As he was ordering her to "move," Bell responded, "I can't." Bell then continued flailing, gesturing, pointing, and giving the middle finger to the MPD officers behind her as she finally was funneled through the magnetometer and out the door shortly after 2:55 p.m. As she exited, an MPD officer behind her pleaded, "Get outta' here, go on, go home, ma'am!"



*Images 29, 30: Stills from CCTV where Bell is flailing, gesturing, pointing, and giving the middle finger as she exits the U.S. Capitol Building.*

***Bell's Assaultive Conduct on the Capitol's North Lawn***

After leaving the Capitol Building, Bell made her way to the Capitol's north lawn. There, other rioters approached a news crew, gave them the middle finger, called them "traitors" and "fake news," and told them to "get out." Bell then approached and joined the confrontation. She moved forward and reached out aggressively, attempting to push or grab at a certain female reporter, who was recording the event on her cell phone. Then, a male in a black mask stepped in to protect the anchor, at which point Bell raised her hand towards him, which he swatted away, and began attempting to kick him. Bell then turned her attention to another female who physically intervened, who Bell attempted to punch, kick, and otherwise fight.



*Images 31-34 (clockwise from top left, Ex. 9 at 00:07 - end):* Bell assaulting news reporters, staff, and others staff on north lawn.

23

### III.    THE CHARGES AND PLEA AGREEMENT

On November 06, 2023, Bell was charged by criminal complaint, which alleged violations of 18 U.S.C. §§ 111(a) and 231(a)(3), among other things. On July 8, 2024, Bell pleaded guilty to a pre-indictment information charging her with one count of Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1) (Count One). ECF 28-31.

### IV.    STATUTORY PENALTIES

Bell now faces sentencing for Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1). As set forth in the plea agreement and the Presentence Report issued by the U.S. Probation Office, the defendant faces up to 8 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, $2,000 in restitution, and a mandatory special assessment of $100.

### V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The parties and the U.S. Probation Office agree with the following guidelines calculation:

**Count One: 18 U.S.C. § 111(a)(1)**

| | | |
|---|---|---:|
| U.S.S.G. § 2A2.2 | Base Offense Level | +14 |
| U.S.S.G. § 3A1.2(a)-(c) | Official victim | +6 |
| U.S.S.G. § 3E1.1 | Acceptance of responsibility | -3 |
| | **Total** | **17** |

PSR ¶ 54; *see* Plea Agreement at ¶¶ 4(A). The parties and the Probation Office agree with the that U.S.S.G. § 4C1.1 does not apply. PSR ¶¶ 44-55; *see* Plea Agreement at ¶¶ 4(C).

24

The Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 58. Accordingly, based on the stipulated total adjusted offense level, after acceptance of responsibility, at 17, Bell's Guidelines imprisonment range is 24 to 30 months' imprisonment. PSR ¶ 104.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Bell's violent, felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Bell violently and intentionally prevented officers from keeping rioters out of the East Rotunda doors. Then, she physically assaulted multiple officers and was relentless in her verbal attacks on them. The nature and circumstances of Bell's offense were of the utmost seriousness, and fully support the government's recommended sentence of 27 months' imprisonment.

### B.  The History and Characteristics of the Defendant

Bell was a 62-year-old mother on January 6, who encouraged her adult daughter to attend the day's events with her. PSR ¶ 22. As set forth in the PSR, prior to her conduct on January 6, 2021, Bell appears to have lived a productive, law-abiding life.

Despite her lack of a criminal history, Bell's belligerent, criminal conduct on January 6 took place over the course of hours, not minutes, and consisted of multiple verbal and physical assaults against police officers and others, indicating that these acts were not momentary lapses in judgment, but a series of terrible, purposeful decisions with violent consequences. Further, Bell's only expression of remorse to date has been in two sentences in the PSR, where Bell reported to Probation that she is only "guilty of physical contact with officers," not assault. PSR ¶ 43 ("I am genuinely remorseful for my actions on January 6, 2021, and I fully accept responsibility for my behavior. I am guilty of physical contact with officers from the Metropolitan Police Department as described in the statement of offense and as alleged in Count 1 (one) of the Information, in violation of Title 18, United States Code, Section 111(a)(1).").

While Bell was diagnosed twenty years ago with certain mental health issues, *see* PSR ¶ 79, those issues should not overcome the severity of the crimes in this case.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Bell's criminal conduct on January 6 was the epitome of disrespect for the law. When Bell climbed the East Rotunda stairs and ultimately entered the Capitol, it was clear that the barricades and police officers who had been protecting the Building had been overwhelmed and overrun. Bell took advantage of this situation as officers were trapped behind the East Rotunda doors she helped keep open and were visibly suffering from the effects of pepper spray. Her efforts to open the doors ensured that additional rioters would flood into the Capitol to assault and impede officers.

After entering the Building under these circumstances, Bell eagerly paraded around, reveling at her illegal entry. She callously cast stanchions to the floor in the Rotunda before relentlessly berating and harassing countless officers who were attempting to protect the Building. Her efforts culminated in a belligerent physical attack on the final few officers who were forcing her to exit the Building. As a member of that mob, Bell was not merely disrespecting the law, she was an active participant in an attack on the bedrock principle of our republic: the peaceful transition of power between democratically elected commanders-in-chief. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that attempts to obstruct official proceedings are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law"); *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America, and that's the peaceful transfer of power.").

### D.    The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[7] The demands of general

---

[7] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of incarceration. Although Bell has no prior criminal history, her decision to participate in the events of January 6, 2021 and her attitude on that day demonstrate the need for specific deterrence. As noted above, from entering the Capitol around 2:36 p.m. through and until she crossed over the Capitol's north lawn as the sky began to grow dark, Bell was belligerent and insolent, chiding anyone who deigned to get in her way. Bell's statement of remorse to Probation indicates that she still has not fully accounted for her actions. This factor weighs heavily in favor of a sentence at the midpoint of the Guidelines range.

### E.   The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national

sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give

"respectful consideration to the Guidelines." *Id.* at 101.

### F.     Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid

unwarranted sentence disparities among defendants with similar records who have been found

guilty of similar conduct."    So long as the sentencing court "correctly calculate[s] and carefully

review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the

need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly

considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United

States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-

disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United

States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the

Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v.

Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being

asked to give a sentence well within the guideline range, and I intend to give a sentence within the

guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to

impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of

sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing

disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and

balanced," and the degree of weight is "firmly committed to the discretion of the sentencing

judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[8]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[9]

---

[8] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[9] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[10] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

This Court previously sentenced Quinn Keen to 24 months' incarceration for similar conduct to Bell's. In *United States v. Quinn Keen*, 23-cr-226-TJK, Keen, like Bell, maneuvered to the front of the police line while outside the Capitol Building. There, he assaulted an officer while that officer was particularly vulnerable, and then threw both a plastic water bottle and metal travel mug at the police line. Unlike Bell, however, Keen did not hold open doors to the Capitol Building, allowing other rioters to flood in. Unlike Bell, Keen also did not act belligerently, threaten property damage, or assault multiple officers while inside multiple different areas of the Capitol Building. Instead, once inside the Building, Keen simply sat inside the Rotunda and smoked marijuana until officers forced him out. Like Bell, Keen pleaded guilty pursuant to a plea agreement to a single charge of assault in violation of 18 U.S.C. § 111(a). The government recommended a 27-month sentence, and this Court sentenced him to 24 months' incarceration.

Bell's conduct was significantly more culpable than that of the defendant in *United States v. Jacquelyn Starer*, 23-cr-00260 (TJK). Starer, like Bell, entered the Capitol through the East

---

[10] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Rotunda doors. However, Starer entered approximately fifteen minutes *after* they had been breached and, unlike Bell, did not contribute to forcing open the doors, over USCP orders, and allowing more rioters to flood into the Building. Unlike Bell, Starer also did not threaten property damage by throwing stanchions, and did not verbally berate nearly ever officer she encountered as Bell did. Finally, although Starer joined a rowdy crowd in the Rotunda, she only physically assaulted one officer, whereas Bell assaulted at least two. Starer pleaded open to her indictment, and the government recommended a 27-month sentence. Citing Starer's medical issues and caretaking responsibility at home, this Court varied downward and sentenced her to 9 months' imprisonment. Bell does not appear to have any similarly mitigating factors that warrant a similar downward variance.

Finally, Bell's conduct is also similar to that of Nicholas Ortt. In *United States v. Ortt*, 24-cr-224-(LLA), Ortt, like Bell, forced his way to the front of the mob. On the west front, Ortt broke through the police line around 2:28 p.m. Like Bell, Ortt assaulted multiple officers, including by grabbing an officer's baton as he pushed through police shields and past officers struggling to keep the line intact. Ortt's actions, like Bell's, diverted officer attention away from other areas and allowed additional rioters to flood deeper into the restricted area. Unlike Bell, Ortt did not enter the Capitol Building itself. Ortt pleaded guilty pursuant to a plea agreement to a single charge of assault in violation of 18 U.S.C. § 111(a). The government recommended a 30-month sentence, and the court sentenced Ortt to 27 months' incarceration.

## VII.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[11]  Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victim for the charged assault is MPD Officer K.A. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Bell must pay $2,000 in restitution, which reflects in part the role Bell played in the riot on January 6.[12]  Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused

---

[11] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[12] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

"approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.). Bell's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶¶ 41, 106.

## VIII.   FINE

Bell's conviction for violation of 18 U.S.C. § 111(a)(1) subject her to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that she is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, Bell has been able to afford a private defense attorney, appears to have a net worth of over $271,000, and had over $70,000 in checking/savings accounts as of June 2024. Thus, Bell has not shown an inability to pay. Therefore, pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court should exercise its authority to impose a fine. § 5E1.2(a), (e).

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 27 months of incarceration, plus three years of supervised release, $2,000 in restitution, a fine, and the mandatory $100 special assessment.

<div style="margin-left: 40%">

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    /s/ Samantha R. Miller
       SAMANTHA R. MILLER
       Special Assistant United States Attorney
       New York Bar No. 5342175
       United States Attorney's Office
       For the District of Columbia
       601 D Street, NW 20530
       smiller@hudoig.gov

       /s/ Carolina Nevin
       CAROLINA NEVIN
       Assistant United States Attorney
       NY Bar No. 5226121
       601 D Street, NW Washington, DC 20530
       (202) 803-1612
       carolina.nevin@usdoj.gov

</div>

# Attachment 1

Index of Government Sentencing Exhibits

| Exhibit | Timecode | Description |
|---|---|---|
| 1 - Making obscene gestures toward east plaza officers | 00:03 - 00:17 | Bell appears from left of screen and begins shaking bike rack barricades; is seen giving the middle finger and repeatedly shouting "fuck you" towards officers at approx. 00:07. |
| 2 - E Rotunda Doors Entry - Bell holding doors - Ofc JP Falls | Full video | Bell's head is seen at approx. 00:04; at 00:06-00:20, her arm can be seen reaching to help pull open the doors as USCP Ofc. T.M. attempts to shut them; remainder of video shows USCP S.A. J.P. losing consciousness into mob after being pepper sprayed and trapped behind doors/rioters. |
| 3 - Rotunda South-2021-01-06_14h25min00s000ms | 01:36 – 02:25 | Bell appears from top right of screen and sits on bench on right side of Rotunda while playing with her American flag (01:36 – 02:05); she then stands up, heads towards middle corridor of room, appears to yell something, then picks up red, velvet stanchion and throws it across the floor (02:05 - 02:23; 2:23 - 02:25). |
| 4 - JaydenX long-- Shooting and Storming Of The US Capitol In Washington DC.mp4 | 00:46 – 01:54 | Bell appears in left middle of screen at approx. 00:46 where she can be heard screaming at officers; at approx. 00:50, she appears to scream "fuckin' assholes" at the USCP officers as she gets in their faces and points at them; at approx. 01:04, Bell stands in front of S.A. K.Y. and screams "fuck you" in his face, while giving him the middle finger; Bell continues barking orders and screaming at the officers, ignoring their commands to leave the area (01:04 – 01:54). |

| Exhibit | Timecode | Description |
|---|---|---|
| 5 - MPD BWC R.S. - BKR6 | 00:03 – end | Bell appears from left of screen and almost immediately begins swearing at officers, stating things like, "don't fuckin' touch me"; at approx. 00:24, Bell stops moving forward, ignoring the officers' commands, forcing the officers to use their batons to physically move her towards the exits and she continues swearing and barking orders at them (00:24-end). |
| 6 - MPD BWC J.S. - BCZM | 00:44 – 01:07 | Bell appears from left of screen and stands directly in front of MPD Ofc. Smith; she gets up close to him, shouts, and shakes her hand in his face, stating: "Get a real job, get a real job! We don't support y'all anymore. Now NO ONE supports you! Nobody!" (00:44 – 00:52); Bell's interaction with Ofc. S.H. is also captured in this BWC (01:00 – 01:07). |
| 7 - MPD BWC S.H. - B8CK | 00:09 – 00:41 | Bell appears from right of screen and barks orders while pointing at MPD Ofc. S.H. (00:09 – 00:14); once Ofc. Smith uses his baton to move Bell forward, she spins around and assaults Ofc. S.H. by throwing her elbow into his chest multiple times (00:14 – 00:29); an officer can be heard stating, "Get outta' here, go on, go home, ma'am!" (00:29 – 00:41). |
| 8 - MPD BWC K.A. - BCQN | 00:13 – 00:30 | Bell appears from left of screen and forcibly assaults MPD Ofc. K.A. (Count One) by shoving her shoulder into his body then grabbing, pulling on, and failing to release his horizontally held baton for nearly 10 seconds (00:19-00:30). |
| 9 - Bell Assaulting Media Personnel on NW Lawn - Twitter | 00:07 - end | Bell appears from left of screen and appears to be stating, "get out!" She then reaches to grab camera from person videoing; at approx. 00:16, she begins to attempt to hit and kick the male; when a female attempts to intervene, Bell then attempts to kick and punch her, too (00:23-end). |

# **Attachment 2**

Victim Impact Statement - Ms. Erin Smith, wife of MPD Officer Jeffrey Smith

Thursday, October 17, 2024

Dear Judge Kelly:

Please accept this written victim impact statement in connection with the sentencing of Defendant, Dana Jean Bell.

Dana Jean Bell should be sentenced to spend the maximum amount of time in jail as she pleaded guilty under oath to a felony charge of assaulting, resisting, or impeding certain officers at the United States Capitol on January 6, 2021.

One of those officers whom the Defendant encountered was my husband, Metropolitan Police Officer Jeffrey L. Smith, who died due to the injuries he received on January 6, 2021. Jeffrey had been a Metropolitan Police Department officer for more than 12 years. He would have celebrated 15 years serving the District of Columbia in July, but because of people like Dana Jean Bell, he didn't get that chance. Jeffrey was a great police officer who served and protected the citizens and visitors of DC, no matter their political views or association.

Dana Jean Bell was captured on Jeffrey's body-worn camera both verbally and physically assaulting my husband, immediately prior to my husband being attacked by two other insurrectionists in the crowd directly behind her.  Perhaps because he was distracted by Defendant Dana Jean Bell, he was left vulnerable to the assault which then took place against him by other members of the mob present with Defendant Dana Jean Bell.  Defendant Dana Jean Bell is clearly captured on Jeffrey's body-word camera stating, "Get a real job! Get a real job! We don't support you. No one supports you."

Well, unfortunately, because of the very real job that Jeffrey had, being a sworn police officer for the District of Columbia, he died protecting democracy itself.

The District of Columbia Police and Firefighters Retirement and Relief Board, and the U.S. Department of Justice Public Safety Officers Benefit Program each ruled that Jeffrey died solely as the direct result of the injuries he suffered on January 6, 2021. That ruling was based on the testimony of Dr. Jonathan Arden, now the former Chief Medical Examiner of the District of Columbia, finding that Jeffrey received traumatic brain injuries and multiple concussions, resulting in his death. These injuries and others would not have occurred if Dana Jean Bell and others had controlled their conduct, and respected not only the police officers who put their lives at risk that day but also what the U.S. Capitol stands for and means to the citizens of this great country and respected Democracy and why we are free to protest for causes we feel passionate about. Unfortunately, this 66-year-old woman woke up on January 6, 2021, and chose violence not only against the men and women in blue who stood to protect the US Capitol but also against members of the media, including Fox News.

The assault of my husband included fractures to his face and sub-orbital cavities, as well the traumatic brain injuries and concussion, all referenced by Dr.  Arden. The first

set of these injuries took place immediately after the incident with Defendant Dana Jean Bell.

Dana Jean Bell is not mentally incapacitated, she knew what she was doing on January 6, 2021, she was cognizant of her actions, and as a resident of the state of Texas, she knows and understands what this country stands for and it is NOT violence, it is not destroying the United States Capitol, and it is not stopping the peaceful transition of power.  Surely, is not assaulting police officers. She also should have known and understood the regulations around entering a federal building, especially one surrounded by police, but ultimately, she made the conscious decision to trespass and engage in illegal activities that have forever changed my life.

She chose to physically engage with police officers including my husband after trespassing a federal building and using any means necessary to assault and berate police, who like my husband held very real jobs, jobs that got four of them killed, and hundreds injured.

Because of the choices this individual made on January 6, I have lost my husband.  I not only lost my husband due to a riot that could have been avoided if this woman and others had not chosen violence that fateful day, but I have also had to endure the long and painful process of proving why and how my husband died. I had to hire a lawyer, have sedition hunters comb through hours and hours of video helping to identify those who attacked my husband (and these sedition hunters indeed identified the Defendant Dana Jean Bell here), hire expert witnesses, prove to the District of Columbia that my husband's death was a Line of Duty death; all while grieving the loss of my husband and the loss of the life I thought I would have for the rest of my life.

Not a day goes by that I don't think about Jeffrey and what our lives could have been and instead of becoming a mother at the age of 35, I became a widow. Defendant Dana Jean Bell should be incarcerated to the maximum extent possible so she can sit and think about the choices she made and how they have affected not only my life but Jeffrey's family, friends, and the MPD. No matter the sentence you decide upon, please remember that I now live a sentence of life without Jeffrey. Defendant Dana Jean Bell should be sentenced to at least a fraction of that time for her misconduct.

Respectfully, Erin Smith