**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
WASHINGTON D.C.**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **VS.** | § | **CASE NO. 1:24-cr-00271-TJK** |
| | § | |
| **DANA JEAN BELL** | § | **JUDGE TIMOTHY J. KELLY** |

**<u>DANA BELL'S SENTENCING MEMORANDUM AND REQUEST
FOR A DOWNWARD VARIANCE</u>**

Defendant Dana Jean Bell, through counsel, respectfully submits the following

Sentencing Memorandum and Request for a Downward Variance. On October 17, 2024,

Dana Bell will come before this Court to be sentenced pursuant to her guilty plea to

Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. §111(a)(1).

Based on all the relevant factors in this case, Dana Bell requests this Honorable Court

impose a below guidelines sentence and submits that a sentence of probation with all

appropriate conditions (including a substantial amount of community service hours) is a

suitable resolution of this matter. Considering the nature and circumstances of the

offense, Ms. Bell's background, the various sentencing factors pursuant to 18 U.S.C. §

3553, and Ms. Bell's prompt acceptance of responsibility and significant, demonstrated

remorse for her participation in the events of January 6, 2021, the proposed sentence is

fair and reasonable as incarceration in this case would be counterproductive. In the

alternative, a sentence with a term of home confinement followed by probation would

provide a sentence that is "sufficient, but not greater than necessary" to achieve the

purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2).

1

## INTRODUCTION

Question: "Were the January 6 protesters duped?"

Scott Pelley, 60 Minutes

Answer: "Yes."

Thomas B. Griffith, Retired U.S. Circuit Judge of the United States Court of Appeals for the District of Columbia

Approximately two weeks before January 6, 2021, Dana Bell watched then President Donald Trump request "American patriots" to come to Washington D.C. as a show of support for him and those in Congress who were challenging the 2020 presidential election results and to help "Stop the Steal." Ms. Bell flew from Texas to Washington D.C. with her adult daughter, believing it was her civic and patriotic duty to answer Trump's call.

When Dana Bell entered the United States Capitol through the East Rotunda doors, another protestor dropped an American flag on the Capitol floor at Dana's feet. Dana did not step on the flag, she did not stomp on the flag, she did not spit on the flag nor attempt to burn it. Dana Bell picked the flag up off the floor and carried it with her the entire time she remained inside the Capitol, making sure the flag was not trampled on or damaged. She did so because she loves America and reveres the flag that stands for the greatest nation on earth. Dana Bell has also always had the utmost respect for law enforcement and has been an active supporter of the officers who wear the badge, protect our citizens and keep our communities safe. Sadly, on January 6, 2021, Dana Bell was caught up in the emotion and group think that political fraud and a conspiracy to steal the presidential election were unfolding inside the U.S. Capitol and that the Capitol police and other Washington D.C. law enforcement officers were, somehow, complicit.

## BACKGROUND

"You've got stuck in a moment
And you can't get out of it."
                    Bono, U2

On January 6, 2021, Dana Bell did not attend the "Save America/Stop the Steal"
rally at the Ellipse. Instead, she arrived at the U.S. Capitol before noon and found a spot
to sit down on the east side of the Capitol. Dana brought her backpack which was full of
snacks and refreshments as she planned to spend the day as a quiet presence in
support of Donald Trump and his Congressional allies. Things were uneventful for the
first couple of hours as the relatively small crowd sat/stood, walked around, mingled,
waved flags, displayed political signs, occasionally shouted pro-Trump slogans, and even
sang the national anthem.

Eventually, more protesters began arriving from the Trump rally at the Ellipse.
Marching and chanting, some were clearly more vocal, rowdy, and "fired up." At some
point, Dana became aware of a commotion and went to investigate. She walked up to the
bicycle rack barricade but stood separate and away from the group of protesters that were
demanding the police allow them to enter the Capitol premises. She briefly jiggled the
barricade to no effect and, stupidly, flipped off an officer, apparently frustrated she could
not get their attention to speak with her. Dana then attempted to wave the officer to her
but was ignored. A group of protesters began to pull open the bicycle rack barricades and
push their way through towards the Capitol. Immediately, scores of protesters began to
walk towards the Capitol and, regrettably, Dana joined them.

Dana made her way in front of the East Rotunda doors. People were packed in
like sardines. It was hard to breathe and, at 5'3" tall, Dana had a limited field of vision

while pressed up against the person in front of her. She was unaware of any deployment by police of a flashbang-like device, unaware of any officers being sprayed with pepper spray or of a riot shield being taken from an officer. Dana was unaware of any officer being overcome or trapped behind a door, nor did she have any awareness of the violence and mayhem that were unfolding on the west side of the Capitol.

Once inside the U.S. Capitol Building, Dana picked up an American flag off the floor and carried it along with her cell phone and a large, bottled water. Always alone, Dana initially sat on a couch in the Capitol's Rotunda to gather herself. As she then walked across the Rotunda floor, a stanchion was kicked and knocked over by a protester directly in front of Ms. Bell and, inexplicably, she knocked over another one immediately in her path. In the Statuary Hall West, Dana can be seen moving a fire extinguisher away from the main footpath of protesters and then calmly using her cell phone to video her surroundings in front of a uniformed Capitol Police officer.

Dana then peacefully and casually wandered various hallways, occasionally taking pictures or videos and talking with other individuals. At one point, Dana engaged in an amiable, protracted conversation with a Capitol security officer as four different uniformed Capitol Police officers walked past, obviously unconcerned with Ms. Bell.

Eventually, Dana made her way to the Speaker's Lobby area just moments after Ashli Babbitt had been shot. Dana looked down at Ms. Babbitt, who was lying at the top of a stairwell, and immediately knew Ms. Babbitt was dead. At that moment, Dana's attitude and demeanor radically changed. She became very upset, even enraged, and started yelling and cursing at several U.S. Capitol Police officers directing them to move the victim, Ms. Babbitt, down the stairwell and not try to take her through the crowded

hallway. After witnessing Ms. Babbitt's death, Dana completely "lost it" and wanted out of the Capitol. She made her way down the halls seeking an exit and began expressing increasing anger and blame towards all the officers she encountered, swearing at and saying "horrible," indefensible things to them.

Numerous Metropolitan Police Department (MPD) officers lined the Capitol Building hallways dressed in tactical gear with helmets, vests, and batons, funneling the protesters towards a specific exit. As the crowd bottlenecked, Dana asked to leave through a different exit, pleading with an officer, "I just want out of here!"

As Ms. Bell was just about to turn the final corner, she still carried in her left hand the American flag, her cell phone and a large, bottled water. She briefly stopped and demanded an officer not touch her. Two different officers then used their "horizontally held batons to forcefully push" Ms. Bell towards the designated exit at least seven times. The first thrust came unexpectedly and from behind, and Ms. Bell reacted by turning and raising her arm and throwing her elbow to prevent the continued baton shoves, making physical contact with an officer's gloved hand and/or wrist.

Ms. Bell was then pushed towards MPD Officer K.A. As Officer K.A. jammed his baton into Ms. Bell's back and ribs, she turned towards the officer and pressed her shoulder into him, making physical contact. Now turned around backwards and with her hands full, she somehow briefly grabbed his baton to prevent another shove and to maintain her balance as Officer K.A. shouted "move!" to which Dana desperately responded, "I can't!"  Remarkably, Dana did not fall and was funneled out the door, still clinging to the American flag, her cell phone, and a bottled water. She was inside the Capitol for approximately 19 minutes.

Once outside the Capitol, still reeling and agitated from being manhandled by the MPD officers and working through the traumatic shock of seeing Ms. Babbitt die before her, Dana had a short-lived confrontation with an apparent news crew. She was summarily brushed aside and disregarded. She soon returned to her hotel.

Distressed and dismayed, Dana rented a car and drove home to Texas.

Dana regrets ever having responded to Trump's call. As Dr. Lisa Clayton notes (please see the attached Exhibit 1, the forensic psychiatric evaluation letter from Lisa K. Clayton, M.D., Forensic and General Psychiatry):

> "Ms. Bell… has had regular nightmares about Ms. Babbitt being shot and… about the events in general." "She feels extremely embarrassed, guilty and shamed about her actions as well as the language she used towards the police and security officers on January 6, 2021." "It is my medical opinion Ms. Bell is being truthful when she expresses her feelings of remorse, guilt, and shame concerning her actions on January 6, 2021 towards all of the law enforcement and security officers she encountered and may have caused them to be harmed in anyway by her actions. Ms. Bell also is genuine when she expresses her profound regret for being "duped" by former President Donald Trump's lies and manipulation causing her to go to Washington D.C. in early January of 2021."

## ADVISORY GUIDELINE RANGE

Dana Bell promptly accepted full responsibility for her wrongdoing and pled guilty pursuant to a written plea agreement with the government. The parties agreed that the base offense level was 14 pursuant to U.S.S.G. Section 2A2.2(a) and that is increased by 6 levels because the victim here was an officer on active duty taking the offense level up to 20 pursuant to U.S.S.G. Section 3A1.2(c)(1). Because of her timely acceptance of responsibility, Dana's offense level is reduced to 17.

Consequently, the defendant has no objection to the Guideline calculations as set forth in the PSR. It is anticipated that at sentencing the adjusted offense level (with acceptance of responsibility) will be 17 with a criminal history category of I (zero

criminal history points) which results in an advisory guideline range of 24 to 30 months.

However, as the Court is well aware, the federal Sentencing Guidelines are not binding, but merely advisory. Moreover, the advisory guideline range is not presumed to be the "correct" sentence to be imposed; indeed, it is error for a sentencing court to presume the advisory range is the appropriate sentence. *Gall v. United States*, 552 U.S. 38, 128 S.Ct. at 596-97 (2007); *Nelson v. United States*, 129 S.Ct. 890 (2009) ("The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable.") (emphasis in original); *Spears v. United States*, 129 S.Ct. 840 (2009) (similar). Instead, the Court's sentencing decision is to be individualized and committed to its sound discretion guided only by the parameters of the statutory maximum and minimum sentence, the factors enumerated in 18 U.S.C. Section 3553, and the directive to impose a sentence "sufficient but not greater than necessary" to comply with the purposes of sentencing set forth in Section 3553(a)(2). *United States v. Hokins*, 498 F.3d 622, 629 (7th Cir. 2007). As is often mentioned, "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall*, 128 S.Ct. at 588 (2007), (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996). As aptly stated by a sentencing court not long ago:

> "[S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant." *United States v. Adelson*, 441 F.Supp.2d 506, 513-14 (S.D.N.Y. 2006).

The basis of this tradition is the notion that the "punishment should fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949); see also *Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55 (1937) ("For the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender.") Thus, this Court should consider much more than the offense committed by Dana Bell when fashioning a unique sentence that is reasonable and appropriate.

### Dana Bell's History and Character

Between the Presentence Investigation Report (PSR) and the forensic psychiatric evaluation letter from Dr. Lisa K. Clayton, an accurate picture begins to emerge of who Dana Bell is. Overall, she has lived a quiet, peaceful life as a loving and devoted wife, mother, daughter, and grandmother. She spent the majority of her now adult children's lives as a stay-at-home mother and remained close and supportive of her own mother who recently passed away in April of this year at the age of 92. However, she has not been immune from hardship, tragedy, conflict, or challenges in her personal and family life. Dana has been married to her husband, David, since 1982. In 2004, he was diagnosed with rectal cancer and their lives were permanently changed. For many years, Dana has suffered from numerous health problems herself, including chronic insomnia, panic attacks, depression, anxiety, and high blood pressure, for which she takes prescription medications accordingly. She has also dealt with Sjogren's syndrome (an immune system illness), vertigo, hypoglycemia, fatigue, and neuropathy in her feet.

Dana has always been proudly patriotic and an active, vocal supporter of law enforcement. During the civil unrest in various American cities in the summer of 2020, Dana wrote numerous thank you cards and letters of encouragement to police officers in the cities affected the most. Wherever Dana has lived, she has always cultivated good relationships with her neighbors and she remains remarkably close to her children and extended family. Yet, these last three and half years have been especially difficult and isolating. When counsel requested to obtain character letters from friends and family, Dana declined because she did not want to intrude on or involve those she loves in a situation for which she is responsible and ashamed.

According to Dr. Lisa Clayton, Dana "has always been a conscientious rule following and law-abiding citizen" who "has been a concrete and rigid rule follower, who has always looked up to law enforcement and other authority figures."  Not surprisingly, Dana's total criminal history score is zero, establishing a criminal history category of I.

## Dana Bell Poses No Risk of Recidivism

It is important to emphasize the lack of a risk of recidivism that exists in this case. Dana Bell is now 66 years old, with troubling medical issues, a first-time offender, a loyal wife, a loving mother and grandmother, who does not use illegal drugs and rarely drinks alcohol. Based on all the factors present with Dana Bell, this Court can confidently find that Dana poses no risk of re-offending in any manner. Accordingly, the sentencing concerns of "incapacitation" and "protecting the public from further criminal activities by the defendant" are non-existent in this case, which means the need for a prison sentence of any length is significantly diminished, if not absent altogether.

Dr. Lisa Clayton writes it is her "medical opinion, Ms. Bell is not in anyway a future danger to law enforcement or anyone else in society." *See* Exhibit 1.

The caselaw, too, makes it clear that in imposing the lowest sentence sufficient to account for the need to protect the public from further crimes of a defendant, this Court should consider the statistically negligible risk of recidivism presented by Dana Bell's unique history and characteristics. See, e.g., *United States v. Holt*, 486 F.3d 997, 1004 (7th Cir. 2007) (affirming below-guideline sentence based on defendant's age, which made it unlikely that he would again be involved in a violent crime); *United States v. Darway*, 255 Fed.Appx. 68, 73 (6th Cir.2007) (upholding downward variance on basis of defendant's first-offender status); *United States v. Hamilton, 323 Fed.Appx. 27, 31 (2nd* Cir. 2009) ("the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines"); *United States v. Urbina*, 2009 WL 565485 at *3 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties); *United States v. Cabrera*, 567 F. Supp.2d 271, 279 (D. Mass. 2008)(granting variance because defendants "with zero criminal history points are less likely to recidivate than all other offenders"); *Simon v. United States*, 361 F.Supp.2d 35, 48 (E.D.N.Y, 2005) (basing variance in part on defendant's age of 50 upon release because recidivism drops substantially with age); *United States v. Nellum*, 2005 WL 300073, at *3(N.D. Ind. Feb. 3, 2005) (granting variance to 57-year-old defendant because recidivism drops with age); *United States v. Ward,* 814 F.Supp. 23, 24 (E.D. Va. 1993)(granting departure based on defendant's age as first-time offender since guidelines do not "account for the length of time a particular defendant refrains from criminal

conduct" before committing his first offense).

### The Court Should Grant Downward Variance and/or Departures<br>Pursuant to Sections 5H1.1 and 5H1.3 of the Sentencing Guidelines

U.S.S.G. § 5H1.1 provides: "Age may be relevant in determining whether a departure is warranted if considerations based on age… in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines."

Section 5H1.3 provides: "Mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines."

Dr. Lisa Clayton's forensic psychiatric evaluation provides a basis for such a downward variance and/or departure. Specifically, Dr. Clayton concludes as her medical opinion that:

> "Ms. Dana Bell's actions when she committed the federal offense of 'Assaulting, Resisting, or Impeding Certain Officers' on January 6, 2021 were the direct result of the trauma Ms. Bell experienced when she witnessed the tragic death of Ms. Ashley Babbitt. On January 6, 2021, Ms. Bell was a 62 year old woman who was already experiencing the mental illnesses of Panic Disorder and Depression and when she witnessed up close the death of Ms. Babbitt which caused her to experience a near psychotic like break that caused her extreme responses of agitation and rage, resulting in her current criminal case."

Furthermore, Dr. Clayton explains that:

> "In reviewing the videotape footage of Ms. Bell from January 6, 2021 prior to her witnessing Ashley Babbitt's gruesome death, Ms. Bell's demeanor was generally calm and friendly towards others including police and security officers. However, after she witnessed Ms. Babbitt's death Ms. Bell's demeanor was totally changed and she began experiencing severe anxiety which was seen in the form of physical and verbal agitation towards the police and security officers whom she blamed for Ms. Babbitt's death. It is my medical opinion Ms. Bell's severely agitated

behaviors were due to her pre-existing mental illnesses and the effects of her witnessing Ms. Babbitt's violent death had on her mental state.

A downward variance and/or departure based upon Ms. Bell's mental and emotional condition—which clearly played a role in her offense conduct—is thus warranted and appropriate in this case.

### Satisfying the Purpose of Deterrence Does Not Require a Prison Sentence

The consensus today is that lengthy prison sentences are not an effective deterrent. The National Institute of Justice, Department of Justice, recently issued a one-page summary of the current state of empirical research about deterrence stating that "[t]he certainty of being caught is a vastly more deterrent than the punishment," "prison sentences are unlikely to deter future crime," and "increasing the severity of punishment does little to deter crime." See, U.S. Dept. Of Justice, Office of Justice Programs, National Institute of Justice, Five Things to Know About Deterrence (July 2014). Similarly, the evidence shows that nonviolent offenders do not need lengthy prison sentences to protect the public.

As Dana Bell awaits sentencing, she is a 66-year-old grandmother who stands 5'3" tall, with physical and mental health concerns. Thankfully, she has a stable home, a supportive husband and family, and the ability and motivation to lead a productive life and remain an essential asset to her children, grandchildren, and community.

### A Probationary Sentence is Both Punitive and Appropriate

The requested sentence of probation for Dana Bell most certainly can fairly and best accomplish the goals of both punishment and deterrence. A sentence of probation on a felony offense is a punitive sentence with real consequences and significant restrictions. As the Supreme Court discussed at some length in *Gall*:

We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. See, *United States v. Knights*, 534 U.S. 112, 119, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) ("Inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled.") (quoting *Griffin v. Wisconsin*, 483 U.S. 868. 874, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987)) Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. USSG Section 5B1.3. Most probationers are also subject to individual "special conditions" imposed by the court.

*Gall*, 552 U.S. at 47-48. Indeed, the Supreme Court in Gall explicitly recognized that a sentence of probation constitutes a "substantial restriction of freedom," and that "[a sentence of] probation is not granted out of a spirit of leniency" nor is a probation sentence "letting an offender off easy." *Id*. at 48, fn.4, (quoting Advisory Council of Judges of National Council on Crime and Delinquency, Guides for Sentencing 13-14 (1957)). Quite the contrary, "the probation or parole conditions imposed on an individual can have a significant impact on both that person and society . . . Often these conditions comprehensively regulate significant facets of their day-to-day lives." *Id*. (quoting N. Cohen, The Law of Probation and Parole Sec 7:9 (2nd ed. 1999)).

More recently, the Seventh Circuit echoed these thoughts in affirming a probationary sentence which was far below the advisory Guidelines. In *United States v. Warner*, the Seventh Circuit affirmed a sentence of probation on a 69-year-old defendant who was a first-time offender, and who had already paid a significant restitution in a parallel civil case. *United States v. Warner*, 792 F.3d 847, 857-60 (7th Cir. 2015). The Court in *Warner* went on to discuss why probation was a substantial punishment, and why the other goals of sentencing, including deterrence, were sufficiently addressed by

the probationary sentence. *Id*. at 860-61. "In these circumstances, we think probation was a sufficiently serious sentence. The Supreme Court reminded us in *Gall* that probation involves a 'substantial restriction of freedom,' and faulted the court below for discounting that fact. 552 U.S. at 48. In sum, while "custodial sentences are qualitatively more severe than probationary sentences of equivalent terms," [citing *Gall*] . . . and in that sense incarceration sends a stronger message than probation does, but Section 3553(a) does not command courts to send the strongest message possible; it commands them to impose a sentence that is 'sufficient, but not greater than necessary' in the circumstances of each case." *Id*. at 860 (emphasis in original). The Sentencing Commission's commentary further confirms that a sentence of probation can be sufficiently punitive and effectively deterrent, in addition to fostering rehabilitation:

> Probation is viewed by many as rehabilitative in nature . . . however, probation is also a punitive measure, and may be used as an alternative to incarceration, provided that the terms and conditions of probation can be fashioned so as to meet fully the statutory purposes of sentencing, including promoting respect for the law, providing just punishment for the offense, achieving general deterrence, and protecting the public from future crimes of the defendant.

*United States v. Brady*, 2004 WL 86414, at *8-9 (E.D.N.Y. Jan 20, 2004) (quoting U.S. Sentencing Guidelines Manual ch. 5, pt. B, Intro. Cmt.).

Like so many others, including law enforcement officers, Dana Bell will never be the same after January 6, 2021, as she punishes herself with regret. She will forever carry the guilt and remorse of her unlawful and offensive behavior. She will forever carry the stigma and humiliation of being a convicted felon. Dana remains embarrassed for her actions and ashamed of the rude and vulgar comments she made to the various law enforcement officers that day.

Ms. Bell is especially mortified and devastated at the thought that her demeaning statements to MPD Officer Jeffrey Smith may have, in some way, contributed to his distress and tragic suicide.

Another element of both punishment and deterrence is the incident that occurred on December 7, 2023.

In April 2022, Dana Bell was contacted by a family member who had seen Dana's photo/FBI BOLO on a local news channel. Dana immediately contacted the undersigned counsel to ask how she could self-identify and/or self-surrender. On April 5, 2022, the undersigned counsel called FBI Special Agent Nick Caslen, Supervisor of the Domestic Terrorism Task Force, Dallas Office. Counsel and Agent Caslen discussed the preference for a peaceable, discrete, quiet surrender without any drama. Agent Caslen agreed to contact another FBI Agent about meeting with an Assistant United States Attorney to discuss a path forward.

On April 8, 2022, Counsel received a phone call from Ryan Locker, Assistant United States Attorney for the Eastern District of Texas. He affirmed to Counsel that a voluntary surrender would be treated favorably and that a surrender and detention hearing combined should be good and would be held locally. AUSA Locker indicated that January 6 cases were "backed up" and referrals to Washington D.C. were pending.

On April 12, 2022, counsel spoke again with AUSA Locker and identified the person wanted in FBI BOLO #318 as Dana Jean Bell. AUSA Locker stated he would check and find out if an active warrant for Ms. Bell existed and that if it did, he would notify Counsel and schedule a self-surrender. AUSA Locker indicated that after fifteen months, Dana Bell was likely a low priority case, and he was doubtful a warrant had been

issued.

On April 13, 2022, FBI Special Agent Laird Hightower called Counsel seeking additional information for Dana Bell. Agent Hightower assured Counsel that "no FBI will show up at her (Dana Bell's) door; surrender will be between AUSA Locker and [Counsel]." During a separate phone call on April 13, 2022, FBI Agent Hightower again promised Counsel that "everything will be through you" regarding Dana Bell's self-surrender. His assurance was without condition or contingency. He stated it would probably take a month or more for the case information to reach Washington D.C. and for a decision on how to charge Ms. Bell.

Eighteen months later, on December 7, 2023, at 6:09 a.m., Counsel received a phone call from a distraught, frightened, and confused Dana Bell. The FBI was banging on her door and announcing over a loudspeaker that they had a warrant for her arrest. Her husband was out of town for work and Ms. Bell was alone. Dana sleeps in the nude and with the aid of Ambien, a prescription sleep inducing medication. Counsel was able to call and briefly speak with FBI Agent "Katy" before Agent "Katy" abruptly hung up. Before Counsel could instruct and direct Dana to get dressed and exit her home, the arresting law enforcement agents forcibly busted in the Bell's front door and Dana walked out. According to a neighbor, there were five or six law enforcement vehicles on the Bell's property and front lawn with at least ten to twelve local and federal officers involved in Dana's arrest. By approximately 10:00 a.m., Ms. Bell made an initial appearance before the Honorable Kimberly C. Priest Johnson, U.S. Magistrate Judge, Eastern District of Texas, was given conditions of release and quickly freed.

The lead federal agent during the arrest of Ms. Bell at her home was none other than FBI Agent Laird Hightower. The same agent who, not once but twice, assured Counsel that the FBI would not show up at Ms. Bell's door and that her surrender would be facilitated between Counsel and AUSA Locker.

The actual purpose and supposed necessity of the raid on Ms. Bell's home and her publicly humiliating arrest are a mystery. The event was terrifying, intimidating, embarrassing and completely unnecessary. The Bells were left with the cost of a new front door, damage to a security camera, damage to their yard and the unquantifiable damage to their reputation and relationships in their neighborhood and local community. Ms. Bell's startling and disconcerting manner of arrest is a form of punishment and deterrence unto itself.

### <u>Avoiding Unwarranted Sentencing Disparities</u>

The following defendants pled guilty to 18 U.S.C. § 111(a)(1) except the last two:

Mark Leffingwell; 21-cr-005-ABJ. Defendant assaulted two officers inside the Capitol by punching them in their heads. He punched one officer twice. The Court sentenced him to 6 months incarceration.

Matthew Council; 21-cr-207-TNM. Defendant assaulted a female officer inside the Capitol by charging a police line and knocking her down. He pushed four Capitol Police Officers back fifty feet. After January 6, he continued to celebrate and defend the actions of the protesters. The Court sentenced him to 6 months home detention.

Grayson Sherrill; 21-cr-282-TSC. Defendant assaulted an officer with a metal pole. The Court sentenced him to 7 months incarceration.

David Blair; 21-cr-186-CRC. Defendant struck an officer in the chest with a lacrosse stick adorned with a Confederate flag. The Court sentenced him to 5 months incarceration.

Joseph Leyden; 22-cr-314-TNM. Defendant advanced and rushed toward an officer then lunged and pushed the officer. Another officer then pushed the defendant away from the first officer. The Court sentenced him to 6 months incarceration.

Jacquelyn Starer; 23-cr-260-TJK. Defendant pled to eight counts including 18 U.S.C. § 111(a)(1). Defendant approached a line of officers and accosted another protester who appeared to be trying to stop the crowd from advancing on the officers. When an officer pushed her away from the line of officers, the defendant struck the officer with her closed fist. This Court sentenced her to 9 months incarceration.

Felicia Konold; 21-cr-160-TJK. Defendant pled to 18 U.S.C. § 231(a)(3). Defendant connected with and joined a group of Proud Boys breaching barriers, joined in a group effort to use the force of her body to try to push back barriers and officers and used her hand to push up on a metal barrier. This Court sentenced her to 45 days incarceration.

James Davis; 21-cr-595-TJK. Defendant pled to a single count of 18 U.S.C. § 231(a)(3). Defendant was a member of the Proud Boys. Defendant engaged with three officers while attempting to breach the police line, all while carrying a long wooden stick in one hand. He pushed against a police riot shield, a police baton and placed his hand on an officer's shoulder. This Court sentenced him to 2 months incarceration.

Dana Bell has no affiliations with any political or militant organizations. She has no social media accounts and did not post any messages on the internet before or after January 6, 2021. She did not plan to participate in disruptive conduct. She did not, nor has she ever, bragged about entering the Capitol or engaging law enforcement. Dana was immediately embarrassed and ashamed of her participation. Dana was part of the early crowd that gathered on the east side of the Capitol on January 6, 2021, sitting, walking and mingling peacefully. Her intent in coming to D.C. was clear by what she wore and what she did that morning. She was wearing normal clothes, not tactical gear, not protective gear – no gas mask, no flak jacket, no helmet, no goggles, and she was not disguised in any way, nor masked to obscure her identity. She did not have or use any weapons – no firearm, no tactical gloves, no pepper spray, no knife, no club, no stick, no pole - and had no intention of getting involved in any altercation whatsoever that day.

Video captures Dana impulsively reacting to the officers' baton thrusts. She did not ball her fist or punch or swing at an officer. She did not charge or attack an officer. She was reactive, not proactive. The physical contact was initiated by the officers, not

Dana Bell. At least one of her hands was full, and at times both. She was certainly no

match for the officers as they escalated the clearing of the Capitol. Quoting Nick Saban,

Ms. Bell got swatted "like a gnat on a cow's ass" and bounced around like a pinball.

Although Ms. Bell's behavior became offensive and her speech vulgar, she never

posed an actual threat to any officer, nor did she cause any bodily pain or physical harm.

None of the officers had a reasonable apprehension of imminent bodily injury, none were

in fear of Dana and the physical contact she made with any officer was de minimis. Her

offense conduct literally occurred in an abrupt, adrenaline -charged moment during a

chaotic episode that lasted only a matter of seconds**.** This is not to minimize her

wrongdoing in any way, just an attempt to put her aberrational conduct in context.

### Dana Bell's Demonstrated Full Acceptance of Responsibility and Post-Offense Conduct Warrants a Reduced Sentence

The "history and characteristics" of Dana Bell point strongly in favor of a

sentence well below the advisory Guidelines. She accepted full responsibility, pled guilty

and did not engage in any frivolous disputes with the government attorneys. She remains

a constant and positive presence at home, providing support to her husband, family and

community. She has been a model defendant while on pre-trial release. She has not done

anything even close to violating the law or an order of this Court. Not merely by her

words, but by her actions, Dana has clearly demonstrated her self-rehabilitation during

the intervening years between the conduct at issue and this Court's sentencing.

Demonstrated 'post-offense rehabilitation" was an appropriate basis for a downward

departure even under the old, mandatory Guideline regime (*United States v. Sally*, 116

F.3d 76 (3rd Cir. 1997) (downward departure for post-offense rehabilitation was proper);

*United States v. Core*, 125 F.3d 74 (2nd Cir. 1997) (same); *United States v. Neuendank*, 2004 WL 419915 (N.D. Ill. Feb. 23, 2004) (delay in prosecution either alone, or in a combination with post-offense rehabilitation, warrants downward departure), and is certainly a proper consideration now that the Guidelines are merely advisory.

The conduct at issue here is clearly a late in life aberration from how Dana Bell has lived her life, both before and after the conduct at issue. This Court can grant a downward variance from the advisory guideline range for aberrant behavior under U.S.S.G. Section 5K2.20. That guideline states that a "court may depart downward . . . if the defendant committed a single criminal occurrence or single criminal transaction that," inter alia, "represents a marked deviation by the defendant from an otherwise law-abiding life." U.S.S.G. Section 5K2.20(b). A majority of sentencing courts follow the majority rule and interpretation of aberrant conduct as articulated in *United States v. Carey*, 895 F.2d 318 (7th Cir. 1990) in which the court held that "a single act of aberrant behavior generally contemplates a spontaneous and thoughtless act rather than one which was the result of substantial planning." This spontaneous and thoughtless standard rests on the belief that "an act which occurs suddenly and is not the result of a continued reflective process is one for which the defendant may be arguably less accountable." *Id.* at 325. While not diminishing the seriousness of Dana Bell's wrongdoing here, her reactive, momentary, resistance and physical contact with the officer was just that – a spontaneous, thoughtless act that was not the result of planning or contemplated malice. While she has accepted full responsibility and pleaded guilty to the conduct charged, there should be no doubt that the conduct underlying this case does not define Dana Bell, nor the type of person, wife, mother, grandmother, and citizen she is.

**<u>Conclusion</u>**

For all the reasons set out above, Dana Bell respectfully requests that the Court impose a sentence of probation considering all the mitigating circumstances. As a 66-year-old woman, with no prior convictions, strong family ties, and debilitating health issues, a probationary sentence provides just punishment and avoids unwarranted sentencing disparity. In sum, a sentence of probation is "sufficient, but not greater than necessary" to impose just punishment, deter, protect the public and provide needed rehabilitation as required by 18 U.S.C. § 3553(a). Under these circumstances, a sentence of probation, rather than "an act of leniency," is a "substantial restriction of freedom," which constitutes a fair and just punishment here. *Gall at 44.*

Respectfully submitted,

/s/ Joe Shearin_____
JOE SHEARIN
State Bar No. 18172300
8150 N. Central Expressway
Suite M1101
Dallas, Texas 75206
214-228-2801
Fax: 214-468-8104
joeshearinlaw@gmail.com
Attorney for Dana Jean Bell

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the 10th day of October, 2024, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system.

/s/ Joe Shearin____
JOE SHEARIN