UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 24-cr-00271-TJK |
| | : | |
| DANA JEAN BELL, | : | |
| | : | |
| Defendant. | : | |

GOVERNMENT'S RESPONSE TO
THE DEFENDANT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this brief response to the Defendant's sentencing memorandum (ECF 39). Because Bell's conduct was belligerent and aggressive both before and after seeing the wounded rioter in the Speaker's Lobby, her assaultive conduct cannot be explained away by a late-disclosed, subjective psychological evaluation. Furthermore, Bell's attempts to blame others for her criminal conduct, including MPD officers and the prior FBI case agent, only serve to underscore why specific deterrence here is needed, and why this Court should sentence Bell to a guidelines sentence of 27 months of incarceration, three years of supervised release, $2,000 in restitution, a fine, and the mandatory $100 special assessment

I. **Bell's Sentencing Memorandum Blames Other People and Things for Her Belligerent, Assaultive Conduct on January 6.**

Despite claiming "significant, demonstrated remorse" (ECF 39 at 1) for her belligerent, violent attacks against law enforcement and others on January 6, Bell instead continues those attacks: she spends the majority of her 30-page memorandum casting blame on others, including the MPD officers who "manhandled" her when she repeatedly refused to exit the premises (*id.*

1

at 6) and including the well-respected, now-retired FBI Special Agent who handled her case through arrest (*id.* at 15-17).

Bell also blames her assaultive conduct on the "traumatic shock" of seeing a fallen rioter, entirely ignoring that her belligerent, violent conduct towards law enforcement started before the Capitol was ever breached on the east side. As the video in government Exhibit 1 plainly shows, before 2 p.m., Bell violently and aggressively shook the bicycle rack barricades denoting the restricted area on the east side. It was not a "jiggle," as Bell would have it. (ECF 39 at 3) Then, while leaning over the barricade, Bell gave officers the middle finger while scowling at them and repeatedly yelling "FUCK YOU" towards them.

This was the tenor Bell set for the remainder of her day on January 6, and the objective evidence shows she acted accordingly: it is simply impossible for Bell to have made her way through hundreds of rioters to the front of the mob, to have stood in front of the shattered glass in the East Rotunda Doors, but to have been "unaware" of every aspect of the riot going on all around her. (*Id.* at 4-5 ("She was unaware of any deployment by police of a flashbang-like device, unaware of any officers being sprayed with pepper spray or of a riot shield being taken . . . was unaware of any officer being overcome or trapped behind a door . . .")). Bell did not act "calmly" (*id.* at 4) when she screamed and celebrated after making it inside the Capitol Building, nor did she act "inexplicably" (*id.*) when she cried out then violently threw a stanchion across the floor in the Rotunda. These were Bell's deliberate, intentional choices, and they foreshadowed what was to come – multiple verbal and physical assaults on law enforcement officers when those officers refused to cede to her commands (not to mention the later assaults on innocent bystanders on the north lawn).

This Court should view with skepticism Bell's attempts to blame other people and things for her criminal conduct on January 6. Instead, those attempts demonstrate that Bell has not actually accepted responsibility for her conduct, conduct that was not simply "physical contact" with officers, as Bell would have it (ECF 36 (Final PSR) at ¶ 43),[1] but assaults on numerous law enforcement officers and others. Indeed, Bell's inability to accept that her conduct amounted to assault underscores the need for specific deterrence in this case, and the need for a guidelines sentence.

## II. Bell's Late-Disclosed, Subjective Psychological Evaluation Should Not Be Credited.

Rather than timely notify the government of its choice to obtain psychological evaluations of Ms. Bell in June and August of this year, the government only learned of these evaluations when the defense filed its sentencing memorandum herein, three days ago. Upon reading the memorandum, the government immediately contacted the defense to request the results of the evaluation, any raw data collected from objective testing, any notes, and any records relied upon by Dr. Clayton. The government reminded the defense of the government's January 2024 request for reciprocal discovery, including any mental health examinations, and the prevailing standards for allowing opposing counsel sufficient time to respond to such substance. *See, e.g.,* ABA Standards for Criminal Justice: Defense disclosure, Standard 11-2.2 (Fourth Ed. 2020) ("(d) The defense attorney should disclose to the prosecution the following additional information and material prior to sentencing: . . . (ii) Any results or reports of tests or examinations of

---

[1] Bell could not even stomach stating she was guilty of "assault" – instead, her statement of remorse to Probation was, "I am guilty of physical contact with officers from the Metropolitan Police Department as described in the statement of offense and as alleged in Count 1 (one) of the Information."

3

persons . . ..").  Despite this, the defense refused to provide any additional materials to the government.

Therefore, the government is limited in its ability to properly respond to Dr. Clayton's letter, but submits that the letter appears to be the type of "diminished responsibility" evidence that courts in this District are taught to be vigilant against.[2] While this is sentencing, not trial, the government is left guessing as to exactly where Ms. Bell's criminal responsibility lies. *See, e.g.,* ECF 39-1 at 8 (opining it was not Bell's own choices but, instead, her "near psychotic like break that caused her extreme responses of agitation and rage" which caused Bell's "current criminal case").

Here, Dr. Clayton's opinions are not grounded in the methods and procedures of science. First, she did not even attempt to confirm the veracity of Bell's self-serving, self-reported statements about her medical history and her conduct on January 6. Despite purporting to perform a *forensic* evaluation to assess Bell's mental state and functioning during a very specific time period – in/around January 6, 2021 – and despite originally evaluating Bell over four months ago, it appears Dr. Clayton never requested or reviewed any underlying medical records to independently and objectively confirm the accuracy of Bell's self-serving reports about prior medical diagnoses, including purported insomnia, anxiety, and/or depression. The sole medical or mental health "record" Dr. Clayton reviewed was a medications list, which Ms. Bell appears to

---

[2] *See, e.g., United States v. Childress*, 58 F.3d 693, 729 (D.C. Cir. 1995) (citing *United States v. Pohlot*, 827 F.2d 889, 905 (3d Cir.1987)) ("The concern underlying these cases appears to be to preserve the barrier between *mens rea* testimony and 'diminished responsibility' testimony. Courts typically allow testimony directly about whether the defendant entertained the requisite intent at the time of the crime . . . They are reluctant, however, to allow more general testimony about the defendant's mental condition where it is divorced from the intent elements of the crime[.]").

have created and provided to Dr. Clayton. (ECF 39-1 at 2) Nonetheless, Dr. Clayton opined that Bell was "already experiencing the mental illnesses of Panic Disorder and Depression" on January 6. (*Id.* at 8).

Second, the only objective testing Dr. Clayton performed was during her first session with Ms. Bell, where Dr. Clayton ran a "brief cognitive skills" test and the Hare Psychopathy Checklist Revised (PCL-R). (*Id.* at 2) Dr. Clayton did not re-run the Hare test during her second evaluation of Ms. Bell to determine whether the results during the first session were an anomaly. Dr. Clayton also did not administer <u>any</u> other objective testing common to forensic exams to determine whether Ms. Bell may have been malingering, such as the Structures Interview of Reported Symptoms (SIRS), "the most commonly used and best-validated assessment in the forensic detection of malingering" which is "a comprehensive assessment for detecting feigned mental disorders, specifically an interview-based measure that consists of 172 items."[3] Despite this, Dr. Clayton concluded that "[o]n both evaluation dates, Ms. Bell's results were the same[.]" (ECF 39-1 at 7). Given the lack of objective or comparative testing, this conclusion is questionable.

Furthermore, Dr. Clayton's opinions run contrary to the objective evidence from January 6, despite that she claims to have reviewed that evidence. (*Id.* at 2) For example, Dr. Clayton must have either ignored or failed to review the video in the government's Exhibit 1 when Dr. Clayton concluded that "prior to her witnessing Ashley Babbitt's gruesome death, Ms. Bell's demeanor was generally calm and friendly towards others including police and security officers." (*Id.* at 8). Apparently (and unsurprisingly), Ms. Bell did not report to Dr. Clayton about her aggressive

---

[3] *See, e.g.,* "A Review of Approaches to Detecting Malingering in Forensic Contexts and Promising Cognitive Load-Inducing Lie Detection Techniques," available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6308182/.

behavior at the bicycle rack barricades prior to 2 p.m., where Bell repeatedly exclaimed, "FUCK YOU" towards police officers defending the restricted area. Dr. Clayton also did not mention the aggressive stanchion throwing in the Rotunda, conduct that was neither calm nor friendly, but which occurred before Bell's assaults on law enforcement and others.

In sum, the Court should give very little weight to Bell's purported clinical examination when fashioning an appropriate sentence here.

### III.   CONCLUSION

For the reasons set forth above and in its original sentencing memorandum, the government recommends that the Court impose a sentence of 27 months of incarceration, three years of supervised release, $2,000 in restitution, a fine, and the mandatory $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   /s/ Samantha R. Miller
SAMANTHA R. MILLER
Special Assistant United States Attorney
New York Bar No. 5342175
United States Attorney's Office
For the District of Columbia
601 D Street, NW 20530
smiller@hudoig.gov

/s/ Carolina Nevin
CAROLINA NEVIN
Assistant United States Attorney
NY Bar No. 5226121
601 D Street, NW Washington, DC 20530
(202) 803-1612
carolina.nevin@usdoj.gov